MILLARD WAREHOUSE, INC., A NEBRASKA CORPORATION, APPELLEE, v. HARTFORD FIRE INSURANCE COMPANY, FIREMAN'S FUND INSURANCE CO., AND THE INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, EACH A CORPORATION, APPELLANTS.

283 N. W. 2d 56

Filed September 11, 1979.   No. 42266.

Pilcher, Howard & Dustin, for appellant Hartford. Ronald H. Stave of the Law Offices of Emil F. Sodoro, P.C., for appellant Fireman's Fund.

Cassem, Tierney, Adams, Gotch & Douglas, for appellant Pennsylvania.

Marks, Clare, Hopkins & Rauth, for appellee.

Heard before BOSLAUGH, MCCOWN, BRODKEY, and HASTINGS, JJ., and FAHRNBRUCH, District Judge.

PER CURIAM.

The defendants, Hartford Fire Insurance Company, Fireman's Fund Insurance Co., and The Insurance Company of The State of Pennsylvania, have appealed to this court from a decree entered by the District Court for Douglas County in an action brought by the plaintiff, Millard Warehouse, Inc., a Nebraska corporation, to obtain a declaratory judgment against the three defendants, requesting that the court construe the provisions of the several policies of insurance issued by the defendant companies to the plaintiff, and praying that the court order each of the defendants to defend the plaintiff in an action brought against it by Ralph E. Tetrick and his wife, Marilyn Tetrick, hereinafter referred to as "Tetricks;" and also that the court order the defendants to pay any judgment that may be rendered against it in that action within the defendants' policy limits.

In its decree entered after trial on June 20, 1978, the court found that the allegations of the petition for declaratory judgment were generally true; and that the defendants, Hartford Fire Insurance Company, hereinafter referred to as "Hartford," and Fireman's Fund Insurance Co., hereinafter referred to as "Fireman's Fund," were obligated under the terms and conditions of their respective insurance policies issued to the plaintiff to defend the plaintiff against the claims asserted by Tetricks in their ac-

tion above referred to, and were also obligated under their policies to pay any judgment for damages awarded to Tetricks in said lawsuit, within the limits of the coverage thereunder. The court further found that the defendant, The Insurance Company of The State of Pennsylvania, hereinafter referred to as "Pennsylvania," was obligated to satisfy any judgment in favor of the Tetricks in excess of the policy limits of the insurance policies issued by the other two defendants, in any amounts within the limits of Pennsylvania's policy, and subject to a deduction for self-insured retention. In this decree, the court also found that the plaintiff was entitled to an allowance of attorney's fees and set the amount thereof, after a separate hearing for that purpose.

The record reveals that plaintiff, Millard Warehouse, Inc., is a corporation generally engaged in the warehouse business in Omaha, Nebraska. In the early 1960's, it bought a parcel of real estate which is now located on the outskirts of the city of Omaha, east of 132nd Street, and bordered on the south by the west branch of the Little Papillion Creek, hereinafter referred to as the "Creek." At the time the real estate was purchased, it was zoned "Industrial." Because of the fact that some of the property bordering the Creek was low-lying, the Omaha city council, in 1974, rezoned the property, including plaintiff's property, as "S-3" zoning, which is "flood plain" zoning. Under that zoning classification, all construction upon the property so zoned was forbidden unless the property level was raised above the 100-year flood level. The above change in zoning became effective on November 20, 1974. Prior to that date, however, the plaintiff had begun filling in its low-lying lots and had constructed a dirt pad adjacent to its existing warehouse, upon which it planned to build an additional warehouse. Pursuant to such plans, plaintiff removed dirt from its property adjacent to the creek banks to complete the fill and build

the pad, widened the channel of the Creek, and graded the banks so as to improve the Creek's capacity during flood stages. After the completion of the pad and fill, and being aware that contentions were being made by certain government agencies that the plaintiff's project would be an obstruction in the Creek and would increase the possibility of upstream flooding, the plaintiff, in 1974, retained the services of one Wilbur F. Rogers, a professor at the University of Nebraska at Omaha, and an eminent hydrologist, to assist in the planning for the construction of the new warehouse upon the fill and pad, and to meet the objections of which plaintiff had been apprised. Dr. Rogers made engineering studies of the flood flows and backwater profiles which had been developed by the Nebraska Natural Resources Commission from previous studies by the U.S. Army Corps of Engineers. In his report, Dr. Rogers concluded that because of channel improvements made by the Millard Warehouse and other improvements made during the construction of the Millard airport, the channel capacity of the west branch of the Creek had been increased, the effect of which was to lower the flood levels. He also pointed out that the Nebraska Natural Resources Commission's backwater profile shows that the expected flood level of the Millard Warehouse pad was actually 3 feet lower than expected flood levels above or below that point; and that the net effect of the work done by the Millard Warehouse actually reduces flood levels. He further concluded that the effects of the improved reach of the Millard Warehouse are transmitted upstream and result in even lower flood levels upstream. He stated that engineering facts clearly show that no adverse flood level effects result as a consequence of the Millard Warehouse construction. He concludes by stating: "I can foresee no adverse effects to property upstream or downstream as the result of the Millard Warehouse con-

struction." Also in his report on the matter made to HUD/FIA in Kansas City, Missouri, dated June 4, 1976, Dr. Rogers in his conclusion stated: "Based upon all observed and calculated expected hydraulic conditions, there is almost no chance that the Millard Warehouse construction will adversely affect 100-year flood flows in the West Branch of the Papillion Creek." Dr. Rogers also concluded that the proposed 100-year flood level determined by the U.S. Army Corps of Engineers was much too high, and, in fact, would be considerably less than their projections.

Based upon the foregoing information, the plaintiff, in April 1975, filed an application before the Omaha city council to have its property rezoned from "flood plain" classification to "industrial." Objections to the requested rezoning were made to the Omaha city council by the Nebraska Natural Resources Commission, the Papio Natural Resources District, and the Omaha Airport Authority. The Omaha city council, after hearing, voted to grant the rezoning of plaintiff's property, but the mayor vetoed that action. However, in April 1976, the city council voted 5 to 2 to override the mayoral veto, and the plaintiff's property was thereupon rezoned to "Industrial," following which the plaintiff proceeded to construct its warehouse upon the pad.

A short time prior to that date, however, to wit, on February 6, 1976, Ralph E. Tetrick and Marilyn Tetrick obtained title to a piece of property located a short distance upstream from the plaintiff's property and on the opposite bank of the Creek, by virtue of foreclosing a mortgage thereon and the issuance of a sheriff's deed to the property following its sale upon foreclosure. On March 3, 1977, after the construction of the plaintiff's warehouse had been substantially completed, Tetricks filed their action against the Millard Warehouse in the District Court for Douglas County for an order requiring the

Millard Warehouse to abate and remove the nuisance, or in the alternative, for a judgment against the Millard Warehouse for $700,000 and general damages. In their petition, the Tetricks alleged the filling and building of the pad by the Millard Warehouse and that the Millard Warehouse was aware that its property was located within the floodway and flood plain of the west branch of the Papillion Creek; that the building and the pad constituted an artifical obstruction in the floodway of the Creek "and as such constitutes a *public nuisance*, specially damaging the plaintiffs as hereinafter alleged." (Emphasis supplied.) They further alleged that the building and pad will impair and impede the flow of the water in the west branch of the Papillion Creek and will considerably raise the level of the water during flood periods so as to flow onto the plaintiffs' (Tetricks) land; and that prior to the construction of the building and pad, plaintiffs' land would not have been inundated by flood water. Tetricks further alleged that their property was damaged and that they "have been deprived of the use of said land *in that* before the plaintiffs can use their land, they will be required to fill or otherwise raise the level of their land at an approximate cost of $700,000.00." (Emphasis supplied.) They alleged further that there will be future damage to the plaintiffs because of the depreciation of the value of their land. Tetrick testified by deposition that he had been damaged because he had intended to use the property for commercial purposes, rather than agricultural, but was unable to obtain commercial zoning as the result of his property being placed in the flood plain, and he therefore suffered a loss of income.

Following the filing of the Tetricks' lawsuit, Millard Warehouse notified the defendant insurance companies of that fact and requested that they provide it with a legal defense to the suit, under the terms of their respective policies. The defendant in-

surance companies declined to do so, and denied that their respective policies required them to provide a defense to Tetricks' action or to pay any judgment entered against the defendant in that action. Thereafter, on May 4, 1977, plaintiff filed its petition for a declaratory judgment in the instant case against the defendants, alleging that the insurance companies were obligated under the terms of their policies issued to plaintiff to defend against the Tetricks' claims and to pay any judgments against plaintiff. All parties thereafter filed motions for summary judgment, which were subsequently overruled; and the matter came to trial, with the results previously indicated.

The types of coverage and pertinent provisions of the insurance policies issued by the defendants in this case were as follows: On October 17, 1973, defendant Hartford issued to plaintiff its special multi-peril policy, effective from October 17, 1973, to October 17, 1976, whereby, in addition to other coverages, it insured the plaintiff against liability by its SMP liability insurance form and comprehensive general liability, with limits up to $300,000 for personal injury or property damage. On October 17, 1976, defendant Fireman's Fund issued to plaintiff its so-called "portfolio policy," effective from October 17, 1976, to October 17, 1979, which, in addition to other forms of coverage, insured plaintiff by a comprehensive general liability clause, with limits up to $300,000 for personal injury or property damage. On October 14, 1973, defendant Pennsylvania issued to plaintiff an "umbrella liability policy" effective for the period from October 14, 1973, to October 14, 1976; and said policy was thereafter renewed for the period of October 14, 1976, to October 14, 1977. Under that policy, defendant Pennsylvania insured plaintiff in the sum of $3,000,000 against liability in excess of its underlying insurance coverages, but subject to a deduction, referred to as a "self-insured

retention," in the amount of $25,000.

The insurance policies issued by defendants Hartford and Fireman's Fund contained substantially identical clauses, reading as follows: "COVERAGE — BODILY INJURY AND PROPERTY DAMAGE LIABILITY.

"The Company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.·

" 'OCCURRENCE' means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured.

" 'PROPERTY DAMAGE' means (1) physical injury to or destruction of tangible property which occurs during the policy period, including loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period."

The "umbrella liability policy" issued by Pennsylvania contains no provisions requiring that company to defend any actions brought against its insured, and plaintiff concedes this fact, and admits that its

reason for making Pennsylvania a party defendant to the lawsuit was because it felt that Pennsylvania was a necessary party to the lawsuit. Plaintiff contends, however, that in the event the Tetricks obtain a judgment against the Millard Warehouse, Pennsylvania under its excess liability provisions is obligated to pay any amount of such judgment in excess of the basic insurance liability for which the other defendants may be liable, less, of course, the self-retention liability of Millard Warehouse. Pennsylvania's liability is limited to the amount of its "Ultimate Net Loss," as that term is defined in its policy.

In their briefs on appeal, defendants list numerous assignments of error, their principal contentions being that the court erred in finding and holding that there was an "occurrence" within the meaning of the policies of insurance issued by them; that the court erred in finding that there was property damage within the policy definitions of that term; that the court erred in its assessment and award of attorney's fees; and, in addition, Pennsylvania has assigned as error the failure of the trial court to find that plaintiff had not exhausted its underlying coverage and its self-retention, which are conditions precedent to coverage under that defendant's policy.

It seems clear that before Hartford and Fireman's Fund have the duty under their policies to defend actions against the insured for damages or to pay claims or judgments against their insured for such damages, it must first appear that such damages were caused by an "occurrence," which term is defined in the policies as meaning an " '*accident*,' including continuous or repeated exposure to conditions, which results in bodily injury or property damage *neither expected nor intended from the standpoint of the insured*." (Emphasis supplied.) Before discussing the question of whether the facts in the instant case do or do not fit within the above definition of "occurrence," we first consider the

question of whether Tetricks' cause of action against Millard Warehouse was properly pleaded in their petition so as to require those insurance companies to defend against the lawsuit. The rule is well settled in Nebraska that an insurer's duty to defend an action against the insured must, in the first instance, be measured by the allegations of the petition against the insured. Woodmen of the World Life Ins. Soc. v. Peter Kiewit Sons' Co., 196 Neb. 158, 241 N. W. 2d 674 (1976); Hartford Acc. & Ind. Co. v. Olson Bros., Inc., 187 Neb. 179, 188 N. W. 2d 699 (1971). It is clear from an examination of the allegations contained in Tetricks' petition that their action against Millard Warehouse is based upon the contention that the actions of Millard Warehouse, in artifically obstructing the floodway of the west branch of the Papillion Creek, constituted a "public nuisance," and they specifically so allege. In Town of Tieton v. General Ins. Co., 61 Wash. 2d 716, 380 P. 2d 127 (1963), a case strongly relied upon by the defendant insurance companies, that court stated: "A complaint alleging an unconstitutional taking or damaging, *or nuisance*, by itself, did not allege an accident." We point out, also, that under the policy definition of "occurrence," an occurrence is specifically defined as an accident, notwithstanding the arguments advanced by Millard Warehouse to the effect that an occurrence is broader than an accident. Also, in American Cas. Co. of Reading, Pa. v. Minnesota F.B.S. Co., 270 F. 2d 686 (8th Cir., 1959), that court stated: "The Farm Bureau had created and maintained a nuisance as was so characterized by the attorney for the claimants and as was charged in the various complaints in the suits against the Farm Bureau in state court. It cannot, logically, be said that the resulting damages complained of were caused by accident." In Clark v. London & Lancashire Indemnity Co., 21 Wis. 2d 268, 124 N. W. 2d 29 (1963), the court held that there is no

duty to defend when a complaint against the insured alleges a nuisance. To the same effect, see Farmers Elevator Mut. Ins. Co. v. Burch, 38 Ill. App. 2d 249, 187 N. E. 2d 12 (1962). While there are concededly cases holding to the contrary, we believe that the rule as stated above constitutes the general rule. In view of the foregoing rules, and particularly in view of the fact that Tetricks' petition contains no allegations as to an "occurrence" or an "accident," it would seem that the defendant insurance companies are correct in their contention that they were not obligated to defend Millard Warehouse in the Tetricks' lawsuit.

Even assuming, however, that the allegation of a "nuisance" could be construed as being sufficiently broad to inferentially allege an "occurrence" or an "accident," we believe that the facts of this case as revealed by the record are insufficient to establish an "occurrence" as that term is defined in the policy provisions. Defendants rely principally upon the following cases in support of their contention that they are not obligated to provide a defense or to pay any judgment which may be rendered against Millard Warehouse. In Foxley & Co. v. United States Fidelity & Guaranty Co., 203 Neb. 165, 277 N. W. 2d 686, decided on April 24, 1979, the policy involved contained the identical definition of "occurrence" as contained in the Hartford and Fireman's Fund policies. The facts of that case were that both Foxley and American Savings Company claimed ownership of a waterline system and hydrants in certain lands in the northern part of an existing water distribution system of an ordnance plant in Mead, Nebraska, each claiming under a quitclaim deed from the United States. Foxley & Co. caused a number of the water hydrants to be severed from the water system under claim of ownership; and American Savings Company then filed an action against Foxley, and recovered a judgment in its ac-

tion, which judgment was not appealed. Foxley & Co. then instituted an action against its insurer for its failure to defend it in the American Savings Company action or to satisfy the judgment. The insurance company took the position that the actions of Foxley & Co. resulting in damage to the water system were intentional and therefore not an "accident" within the meaning of the policy provision. In our opinion we held that where one intentionally does damage to the property of another in the mistaken belief that the property belongs to him, the property damage is not, within the meaning of an insurance policy, an "accident" neither expected nor intended from the standpoint of the insured. In our opinion we quoted with approval Thomason v. United States Fidelity & Guaranty Co., 248 F. 2d 417 (5th Cir., 1957), where that court stated: "Where acts are voluntary and intentional and the injury is the natural result of the act, the result was not caused by accident even though that result may have been unexpected, unforeseen and unintended."

All three defendants cite and rely upon the case of Town of Tieton v. General Ins. Co., *supra*, in which the Supreme Court held that contamination of the property owner's well caused by seepage from a sewage lagoon, which was located approximately 300 feet from the well and which had been constructed by the town with knowledge of the potential hazard of pollution, was not caused by "accident" within the town's liability policy covering injury to property caused by accident. In that case it was stipulated that the lagoon was designed by and constructed upon the advice and with the approval of certain professional engineers employed by the town of Tieton, and that the lagoon was constructed by the town in a manner which was approved by state and local health agencies. It was operated precisely in the manner planned, expected, desired, and intended, and in the same manner as numerous other sew-

age lagoons similarly designed and planned. The town of Tieton did not intend that the well would become contaminated, but the record indicated that the seepage is the normal and expected result of the operation of this type of sewage facility. There was no dispute that the state agencies, the town, and the engineers recognized the possibility of contamination of the well. The mayor testified that the main basis of his and the town council's determination to assume the risk of the danger of contamination was the fact that the engineers had obtained the approval of the pollution control commission and the state health department regarding the location and construction of the lagoon. The court in its opinion stated: "No one contends that the contamination of the well was intended. Yet, the lack of such intent does not by itself compel us to conclude that such result was 'caused by accident.' The element of foreseeability cannot be ignored. * * * The evidence most favorable to respondent supports no more than a finding that respondent took a calculated business risk that the Pugsley property would not be damaged. * * * But, when, under the facts of this case, the possibility of contamination became a reality, it cannot be said that the result was 'unusual, unexpected, and unforeseen.' " In City of Kimball v. St. Paul Fire & Marine Ins. Co., 190 Neb. 152, 206 N. W. 2d 632 (1973), the court distinguished Town of Tieton v. General Ins. Co., *supra*, and impliedly approved that case upon its distinctive facts, by stating: "We have no question about that case. It is readily distinguishable from the instant one. The Town of Tieton had several reports in writing that there was a possibility of contamination of the adjoining property owner's well because of the nature of the soil. Disregarding this possibility, it went ahead with construction without making a prior arrangement with the well owner." In the City of Kimball case there was no evidence that the city ever had any knowl-

edge of the possibility of contamination of the well.

It is Millard Warehouse's contention that because of the fact it followed the advice of its own expert, a hydrologist, after being forewarned of the possibility of resulting flood damage from the erection of its building and pad, that it cannot be said the resulting damage, if any, was intended or expected. The president of the warehouse, Larry Larsen, specifically testified that he did not intend to cause harm or damage to any property owner, and relied upon the conclusion and advice of his own expert in that regard. A similar contention was made in the case of Hardware Mut. Cas. Co. v. Gerrits, 65 So. 2d 69 (Fla., 1953). In that case the court stated: "Assuming that the surveyor made a mistake in locating the boundary line and that the Plaintiff relied on the erroneous survey, nevertheless the fact Plaintiff constructed his building so that it encroached upon the adjoining lot cannot be termed an accident. When a person understands facts to be other than they are and is free from negligence, a 'mistake of fact' occurs. An effect which is the natural and probable consequence of an act or course of action is not an *accident*. The effect which was the natural and probable consequence of the Plaintiff's act in erecting the building was the encroachment on the adjoining property. This is true whether the Plaintiff knew the facts as they were or understood them to be other than they were. The result or effect would be the same.

"Plaintiff deliberately and designedly (although erroneously) located the building on a part of the adjoining property and he intended to build it at that particular site. The fact that he relied upon a survey does not change the situation in the least. To hold that the mere fact the surveyor made a *mistake* and that the Plaintiff in reliance on the erroneous survey, constructed his building on the adjoining property by *accident* would lead to the result that

one insured, who relied on his own calculations of where the true boundary line existed, and encroached on contiguous property would be denied a recovery, and another insured, who relied on a survey, would be allowed to recover. The inequitable consequences of such an interpretation forbid *our concurrence* therein." Similarly, in Thomason v. United States Fidelity & Guaranty Co., 248 F. 2d 417 (5th Cir., 1957), the court held that a policy undertaking to pay damages because of injury to or destruction of property caused by "accident" did not cover damage caused by trespass upon the property of a country club by an employee of an insured contractor, when an employee operating a bulldozer mistakenly took out-of-bounds markers of the club for the boundary stake and cleared up to them, since the trespass was the result of mistaken and erroneous belief of the employee as to where he was to go for the doing of that which he was directed to do.

Similarly, although Larsen, the president of Millard Warehouse, contends that he acted pursuant to the best advice of his hired expert, and that he had no intention of causing harm, it appears that he took a calculated risk in so doing, after being advised of the possibility of flood damage, and that his actions in constructing the warehouse and pad did not constitute an "occurrence" or "accident" as defined in the policies issued by the defendant companies. In view of our conclusion, we deem it unnecessary to deal with other issues raised in the briefs of the parties.

We conclude that the trial court erred in ordering Hartford and Fireman's Fund to defend the plaintiff herein in the Tetricks' action, and to pay all damages and judgments awarded to said Tetricks; and also in ordering Pennsylvania to afford coverage and pay any amounts as excess coverage under their policy. We also find that the trial court erred in awarding attorney's fees to plaintiff for the serv-

ices of its attorney because of its failure to prevail in this appeal; and that the judgment of the District Court must be and hereby is reversed.

REVERSED.

BRODKEY, J., dissenting.

I must respectfully dissent from the majority opinion. Not only do I feel that it has applied incorrect legal principles, but I feel the result is highly inequitable.

I start my discussion with the very recent case of Pachucki v. Republic Ins. Co., 278 N. W. 2d 898, decided May 30, 1979, by the Supreme Court of Wisconsin. The homeowner's policy in that case provided that the policy did not apply to bodily injury or property damage which is either expected or intended from the standpoint of the insured. In its opinion the court outlined three general rules that have emerged with respect to the construction of an intentional tort exclusion, as follows: "(1) The minority view follows the classic tort doctrine of looking to the natural and probable consequences of the insured's act; (2) The majority view is that the insured must have intended the act and to cause some kind of bodily injury; (3) A third view is that the insured must have had the specific intent to cause the type of injury suffered." The same rule would apply to property damage.

Which view has Nebraska adopted? I believe that Nebraska has clearly adopted the majority rule. In State Farm Fire & Cas. Co. v. Muth, 190 Neb. 248, 207 N. W. 2d 364 (1973), which case involved a homeowner's insurance policy containing an exclusion for "bodily injury . . . which is either expected or intended from the standpoint of the insured," although admittedly factually dissimilar from the instant case, this court clearly stated: "We hold on the basis of the authorities which we hereinafter cite that, under the language of the exclusion in question, an injury is either expected or intended if the in-

sured acted with the specific intent *to cause harm to a third party.* It seems to us to be immaterial whether the injury which results was specifically intended, i.e., the exclusion would apply even though the injury is different from that intended or anticipated.'' (Emphasis supplied.) This to me clearly indicates the adoption of the majority rule referred to above. State Farm Fire & Cas. Co. v. Muth, *supra*, has never been overruled by this court, and still remains the law of this state. Foxley & Co. v. United States Fidelity & Guaranty Co., 203 Neb. 165, 277 N. W. 2d 686 (1979), cited in the majority opinion, was a division opinion, not an opinion of the full court, and involved a mistake of law rather than a mistake of fact. However that may be, the fact remains that although the court mentioned Muth in passing, it did not specifically overrule Muth. The specific holding in Foxley is set out in the opinion as follows: ''While we are aware of cases to the contrary, we hold that a policy undertaking to pay damages because of injury to or destruction of property caused by accident does not cover damages caused by the trespass of the policyholder upon the land of another when the damage is the natural result of the intentional act of the policyholder.''

In this case, the record is clear that Millard Warehouse did not build the pad or the warehouse with the specific intention of causing harm to the Tetricks or any other person. Not only did the president of the corporation, Mr. Larsen, not harbor any such intention, as he testified, but on the contrary he had been assured by a competent expert, and on the basis of his own experience with the Creek extending over a long period of years, that the threatened flood danger was exaggerated and practically nonexistent, and could safely be disregarded. There is also evidence in the record establishing there have been no floods despite the fact that there have been very heavy downpours of rain in the intervening years.

Nor is it likely that Millard Warehouse would have intentionally risked its very large investment in its physical facilities, or the 10 million dollars in customers' property stored on its premises, by intentionally and knowingly increasing the danger of loss or damage which would be caused by the flooding of its premises. Under the majority rule, above cited, it is clear that Millard Warehouse did not intend damage to anyone; and hence the policy exclusion is not applicable, and the insurance companies should be required to defend the lawsuit brought by the Tetricks. We might add that the authorities cited by the majority are clearly distinguishable from the instant case for the reason that in none of the cases cited by the majority had the insured ever received expert or professional advice, contrary to the claims of the government agencies involved, that it was safe to proceed with the course of action planned, as was true in this case.

As a further basis for reversing the judgment of the District Court, the majority opinion makes two other points. They cite the general rule adopted in Nebraska to the effect that the duty of an insurance company to defend an action must at the outset be judged by the allegations contained in the pleadings filed by the third party against the insured. They point out that the Tetricks' lawsuit specifically alleges that the construction of the warehouse and pad by Millard Warehouse constitutes a "public nuisance," and they cite authorities in support of the rule that an allegation of a "nuisance" by itself does not allege an accident, none of which cases are, however, Nebraska cases. We point out, however, that there is a split of authority in the country on the question, and there are also many decisions holding to the contrary. See, Annotation, Allegations in third person's action against insured as determining liability insurer's duty to defend, 50 A.L.R. 2d 458; Annotation, Injury from nuisance maintained by in-

sured as within coverage of public liability policy, 98 A.L.R. 2d 1047.

In White v. Smith, 440 S. W. 2d 497 (Mo. App., 1969), the court stated: "Instant plaintiffs' suit was 'for nuisance.' An actionable nuisance may be ' "anything wrongfully done or permitted, which injures or annoys another in the enjoyment of his legal rights." ' '[N]uisance is a condition, and not an act or failure to act of the person responsible for the condition.' 66 C.J.S. Nuisances § 11a, 1.c. 752. It does not rest or depend upon the degree of care used, but upon the degree of danger existing with the best of care. So, in determining liability for the maintenance of a nuisance, whether defendant was negligent and what his intention, design or motiff may have been alike became immaterial."

Also, in Grand River Co. v. Ohio Cas. Ins. Co., 32 Ohio App. 2d 178, 289 N. E. 2d 360 (1972), the court stated: "The amended petition in the Lake County case contains two causes of action, each founded upon different theories of liability. The first cause of action contains allegations of nuisance and trespass. It is alleged that Grand River was guilty in the following respects. * * * [i]n allowing said industrial wastes to be emitted in large quantities from their stacks and to settle on the person, houses, automobiles, and other chattels of the plaintiff, constitute a continuing nuisance and trespass in the following particulars, to wit: * * *.

"The allegations as made in the second ǫause of action assert the knowledge and willful intent of the defendant. Such allegations are not based upon nuisance, trespass or negligence as such are to be found in the first cause of action.

"We hold, and the plaintiff concedes, that the defense of the second cause of action could not be required under the definition of 'occurrence' as contained within the policy. Such allegations would not constitute a claim for damages 'neither expected

nor intended from the standpoint of the insured.'

"However, allegations of knowledge and intent do not appear in the first cause of action, and could well come within the meaning of 'occurrence' as contained within the policy." See, also, Wolk v. Royal Indemnity Co., 27 Misc. 2d 478, 210 N.Y.S. 2d 677 (1961). I am of the opinion that the duty of an insurance company to defend under its policy should not rest upon a narrow interpretation of perhaps loosely used words in a petition, words chosen by a third party suing the insured, but should be controlled by the actual facts of the case; and the nature of the Tetricks' claim is such as to require the defendant insurance companies to defend.

I also note that the Tetricks' case is still pending trial; and that as plaintiffs therein, the Tetricks may still have the opportunity, and may well decide, to amend or add allegations to their petition, with the result that defendants might be obligated to render a defense to Millard Warehouse.

I would sustain the judgment of the District Court, and would also, as did that court, allow attorney's fees for plaintiff's attorney in the amount it determined after a separate hearing thereon, without, however, allowance of interest on said attorney's fees.

FAHRNBRUCH, District Judge, joins in this dissent.